```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/09
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOAN OCHEI,

                                    Plaintiff,                    07 Civ. 0968 (PKC)
                                                                 07 Civ. 0969 (PKC)
                    -against-
                                                                 MEMORANDUM
                                                                 AND
ALL CARE / ONWARD HEALTHCARE and                                 ORDER
HEALTH AND HOSPITAL CORPORATION,

                                    Defendants.
-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

          Plaintiff Joan Ochei, who initially was represented by counsel but now is pro se,

brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.

("Title VII"), the New York State Human Rights Law, N.Y. Exec. L. §§ 290 et seq.

("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et

seq. ("NYCHRL"), against All Care / Onward Healthcare ("All Care") and New York City

Health and Hospitals Corporation ("HHC").  Plaintiff was employed as a per diem Licensed

Practical Nurse ("LPN") by All Care and was assigned to various HHC facilities from 2000 to

2005.  Plaintiff alleges that defendants unlawfully discriminated against her and subjected her to

a hostile work environment based on her gender and national origin, Nigerian.  Defendants move

for summary judgment under Rule 56, Fed. R. Civ. P.  For the reasons explained below, their

motions are granted.

BACKGROUND

A. Facts

　　　　The following facts are undisputed and are derived from the parties' Local Civil

Rule 56.1 statements, affidavits, depositions, and submissions.[1]  To the extent that the facts are

contested, all reasonable inferences are drawn in favor of plaintiff.


　　　　1. The Parties

　　　　Plaintiff is of African descent and is from the nation of Nigeria.  (Pl. 56.1 at 3 ¶

3.)  She was hired by All Care on April 16, 1999 and worked for All Care until November 2005.

(Id. at 3 ¶ 5, 4 ¶ 7, 10 ¶ 6.)  All Care is a temporary job placement agency that places healthcare

workers in various healthcare facilities and clinics on a per diem basis.  (Id. at 3 ¶ 4; O'Keeffe

Aff. ¶ 2.)  Plaintiff was paid by All Care an hourly wage on a per diem basis.  (Pl. 56.1 at 3-4 ¶ 6,

4 ¶ 8, 10 ¶ 5.)  Plaintiff did not have an express agreement with All Care providing that All Care

would assign plaintiff to a specific healthcare facility of her choice.  (Id. at 11 ¶ 8.)  Rather, All

Care would call plaintiff at home and give her a list of healthcare facilities requiring nursing

assistance, and plaintiff would use her discretion in deciding whether to accept or decline a given

assignment.  (HHC 56.1 ¶ 9; Pl. 56.1 at 12 ¶ 12; Pl. Aff. ex. A at 85:6-14.)

　　　　During her period of employment by All Care, plaintiff received assignments at

various HHC facilities.  (Pl. 56.1 at 11 ¶ 9.)  HHC is a government department within the City of

---

[1] Exhibits attached to plaintiff's affidavit in opposition to defendants' motion for summary judgment are referred to
herein as "Pl. Aff. ex. [X]."  Exhibits attached to plaintiff's submission "Exhibits on File" are referred to herein as
"Pl. Exhibits ex. [X]."  Exhibits attached to the declaration of Jamie M. Zinaman, counsel for HHC, in support of
defendants' motion for summary judgment are referred to herein as "Zinaman Aff. ex. [X]."  Exhibits attached to the
declaration of Michael Fahey, counsel for All Care, in support of defendants' motion for summary judgment are
referred to herein as "Fahey Aff. ex. [X]."  HHC's Local Civil Rule 56.1 statement of undisputed facts is referred to
herein as "HHC 56.1 ¶ [X]."  Plaintiff's response to defendants' Local Civil Rule 56.1 statement of undisputed facts
is referred to herein as "Pl. 56.1 at [X] ¶ [X]."  The affidavit of Peter O'Keeffe, a vice president at All Care, is
referred to herein as "O'Keeffe Aff. ¶ [X]."

New York.  (<u>Id.</u> at 30 ¶ 3.)  It is the governing body for all hospitals and other healthcare

facilities operating under the ownership of the City of New York.  (<u>Id.</u>)  During her assignments

at HHC facilities, plaintiff was paid by All Care, but HHC exercised substantial control over the

details and methods of plaintiff's work.  (<u>Id.</u> at 13 ¶ 14; Pl. Aff. ex. A at 87:12-16.)  Plaintiff also

was assigned sometimes to non-HHC facilities.  (<u>Id.</u> at 90:16 - 91:4.)


         2. <u>Plaintiff was Transferred Between HHC Clinics and Facilities</u>

         Plaintiff was first assigned by All Care to an HHC facility, the Renaissance

Health Care Network, in 2000.  (Pl. 56.1 at 13 ¶ 14.)  Plaintiff frequently would be transferred

from one HHC clinic to another, depending on a given clinic's staffing needs on a particular day.

(<u>Id.</u> at 14 ¶ 15, 17 ¶ 24; HHC 56.1 ¶ 16.)

         Sometime in 2000, while plaintiff was assigned to Renaissance, plaintiff received

a call from an All Care coordinator who informed her that she should not return to that facility

because All Care's contract with HHC for that assignment had been terminated.  (Pl. 56.1 at 15 ¶

19.)  The following week, plaintiff was assigned by All Care to a different HHC facility, Grant.

(Pl. 56.1 at 16 ¶ 20.)  Plaintiff believes that three or four other nurses, who also came through All

Care, were hired by HHC to work at Renaissance.  (Pl. Aff. ex. A at 101:17-23.)  According to

plaintiff, her own qualifications were the same as or better than the qualifications of those hired

as full-time staff.  (<u>Id.</u> at 102:10-11.)

         In 2003, plaintiff was assigned by All Care to carry out an immunization

campaign at several facilities.  (Pl. 56.1 at 17 ¶ 23; Pl. Aff. ex. A at 130:1-11.)  When the

campaign was complete, plaintiff's assignment was terminated.  (Pl. 56.1 at 17 ¶ 23; Pl. Aff. ex.

A at 130:11-17.)

Also in 2003, plaintiff was assigned by All Care to work at a pediatric unit at Saint Nicholas, another HHC facility.  (Id. at 133:21-22; Pl. Exhibits ex. G.)  The director of nursing, Ms. Smith, transferred plaintiff to the Dyckman clinic.  (Pl. Aff. ex. A at 133:12-14.)  From there, plaintiff was subsequently transferred to the Drew Clinic.  (Id. at 133:16-17.)  Plaintiff viewed these transfers as discriminatory because she liked working at Saint Nicholas and believed she would be working there permanently.  (Id. at 133:23 – 134:5.)  Nonetheless, plaintiff was transferred back to Saint Nicholas to fill in on occasions when another nurse was absent.  (Id. at 137:9-12.)

The next allegedly discriminatory transfer occurred in 2005.  (Id. at 108:15 – 109:22.)  In 2005, she returned to Renaissance to work at their Sydenham facility.  (Pl. 56.1 at 16 ¶ 21; Pl. Aff. ex. A at 108:23-24.)  She was sent there by Ms. McBride, the assistant director.  (Id. at 108:25 – 109:1.)  Plaintiff believed that she had an oral agreement with Ms. McBride that she would work solely at Sydenham and would not be transferred elsewhere.  (Id. at 110:19 – 111:1.)  However, after beginning work at Syndeham, plaintiff was "transferred from clinic to clinic on a daily basis" and was ultimately transferred "to the most difficult unit, which is the Drew Clinic."  (Id. at 110:14-18.)  Plaintiff disliked working at the Drew Clinic because many of its patients are difficult and "don't follow directions."  (Id. at 128:3-8.)  Plaintiff explained that the reason she was transferred was that "[w]hen a nurse does not show up, I am sent there to work in her place."  (Id. at 117:23-25.)  Nonetheless, it was her understanding that she could have "said no" to any given transfer assignment.  (Id. at 118:17-19.)  Plaintiff does not know whether other All Care employees were also asked to transfer to other facilities.  (Id. at 122:17-22.)  It was "well understood" by plaintiff that when Ms. McBride sent her to another clinic "it mean[t] that that clinic [was] short of nurses."  (Id. at 124:22-25.)  Nonetheless, on occasion,

plaintiff objected to Ms. McBride's instruction that she go to work at a different clinic.  (Pl. 56.1 at 16-17 ¶ 22; Pl. Aff. ex. A at 123:8-21.)

### 3. Plaintiff was not Hired as a Permanent Employee by HHC

HHC procedures require a person who wishes to apply for a permanent position to submit an employment application to the Human Resources Department of the hospital facility. (Pl. 56.1 at 18 ¶ 27.)  In 2003, following her performance on the immunization campaign, plaintiff applied for a permanent position with HHC.  (Pl. Aff. ex. A at 145:1-6, 148:18-22.)  In applying, she told Ms. McBride that her hope was to gain the benefits of full-time employment. (Id. at 150:18-21.)  Plaintiff was not hired, and this led plaintiff to infer that Ms. McBride did not want her to get employment benefits.  (Id. at 151:6-15.)

Plaintiff was evaluated by HHC at least twice, in 2004 and 2005, and both evaluations were satisfactory.  (Pl. 56.1 at 13 ¶ 13.)  Plaintiff applied again for permanent employment on one or two additional occasions.  (Id. at 164:21 – 165:8.)  On one occasion, in 2004, plaintiff applied for a permanent position with Behavioral Health in Metropolitan Health Center, an HHC facility, but was told that all of the hospital's LPN lines were currently filled. (Id. at 19 ¶ 28; Zinaman Decl. ex. I.)  Plaintiff believes that the reason she was not offered a permanent position was that Ms. McBride did not want her to get benefits.  (Pl. 56.1 at 20 ¶ 30.) Plaintiff believes that no other Nigerians were hired by HHC, although she does not know whether any others applied.  (Id. at 162:21 – 163:4.)

4. <u>Plaintiff was Involved in Several Altercations at HHC Facilities</u>

On May 3, 2004, plaintiff and a Patient Care Associate, Ms. Diaz, were involved in a physical altercation.  (Pl. 56.1 at 20 ¶ 31.)  Ms. McBride decided that plaintiff and Ms. Diaz would no longer work at the same clinic at the same time.  (Zinaman Decl. ex. J.)

On November 1, 2005, an altercation occurred between plaintiff and an HCC clerical employee, Donald Waiters, while both were working at the Drew Clinic.  (Pl. 56.1 at 20 ¶ 32; Pl. Aff. ex. C at 8:20 – 9:4.)  During this altercation, Mr. Waiters said he would call immigration to have plaintiff deported.  (Pl. 56.1 at 22 ¶ 38.)  Plaintiff called 911 to report this dispute with Mr. Waiters.  (<u>Id.</u> at 21 ¶ 33.)  On previous occasions, Mr. Waiters had made sexual gestures toward plaintiff that she found offensive.  (Pl. Aff. ex. C at 12:19 – 13:19.)  Plaintiff had never made a formal complaint about Mr. Waiters prior to this incident, but she complained about his sexual gestures and derogatory remarks to a coworker.  (Pl. 56.1 at 21-22 ¶ 35.)  Plaintiff believes that Mr. Waiters got a warning after this incident because he was transferred to another clinic.  (Pl. Aff. ex. C at 17:20-22.)  Mr. Waiters had never previously made a derogatory comment about plaintiff's immigration status, and never did so again.  (<u>Id.</u> at 16:10 – 17:11, 18:2-5.)

At the time of the incident with Mr. Waiters, another HHC employee, Ms. Cox, a Patient Care Associate, made a statement referring to plaintiff's Nigerian nationality and stating that plaintiff "didn't belong here, to work here."  (Pl. 56.1 at 24 ¶ 42, 25 ¶ 44.)

On November 17, 2005, an altercation occurred between plaintiff and another HHC employee, Ms. Ramos, a Patient Care Associate, while both were working at the Drew Clinic.  (Pl. Aff. ex. C at 27:22 – 33:17.)  Ms. Ramos accused plaintiff of discriminating against Hispanic patients, provoking plaintiff to respond by raising her voice in an area of close

6

proximity to patients.  (Id.)  Plaintiff complained about Ms. Ramos to Ms. McBride, but never

filed a formal written complaint.  (Pl. 56.1 at 25-26 ¶¶ 46, 49.)  Plaintiff found the presence of

Ms. Ramos at the facility to be disruptive.  (Id. at 27 ¶ 50.)  The day after this incident,

November 28, plaintiff received a call from All Care directing plaintiff to leave this facility

immediately because HHC had terminated her assignment.  (Id. at 27 ¶ 52; Pl. Aff. ex. C at

92:22-25.)


B. Procedural History

Plaintiff filed a complaint against All Care with the U.S. Equal Employment

Opportunity Commission ("EEOC") on December 2, 2005.  (Pl. Exhibits ex. L; Pl. 56.1 at 7 ¶

18.)  She then filed a verified complaint with the State Division of Human Rights ("SDHR") on

December 8, 2005.  (Zinaman Decl. ex. O; Pl. 56.1 at 28 ¶ 53.)  In a "Determination and Order

After Investigation" dated September 15, 2006, the SDHR "determined that there is NO

PROBABLE CAUSE to believe that the respondent has engaged in or is engaging in the

unlawful discriminatory practice complained of."  (Zinaman Decl. ex. P.)  On November 7,

2006, the EEOC sent plaintiff a right-to-sue letter.  (Id. ex. Q; Pl. 56.1 at 7 ¶ 19, 29 ¶ 55.)  It

stated that the EEOC was closing its file on plaintiff's complaint because "[t]he EEOC has

adopted the findings of the state or local fair employment practices agency that investigated this

charge."  (Zinaman Decl. ex. Q.)

Plaintiff filed separate complaints against All Care and HHC on February 9, 2007.

The two actions were consolidated by a stipulation dated February 5, 2008.  Plaintiff filed her

First Amended Complaint ("A.C.") on March 19, 2008.  Defendants filed answers on April 4,

2008.  Thereafter, plaintiff's attorney was permitted to withdraw from representing plaintiff and

plaintiff moved to have counsel appointed.[2]  Magistrate Judge Ellis denied this motion without prejudice in an Opinion and Order dated July 31, 2008.  (Doc. #45.)  Plaintiff, now proceeding pro se, moved for leave to file a Second Amended Complaint on September 3, 2008.[3]  Defendants moved for summary judgment on September 8, 2008.

DISCUSSION

I. <u>Summary Judgment Standard</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  It is the initial burden of the movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief.  See <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004).  A fact is material if it "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  See <u>id.</u>

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial" and cannot "rely merely on allegations or denials in its own pleading."  Fed. R. Civ. P. 56(e)(2).  In raising a triable issue of fact, the non-

---

[2] Plaintiff's motion to proceed <u>in forma pauperis</u> is moot.  Plaintiff paid the Clerk's filing fee in both actions.

[3] Although plaintiff is <u>pro se</u>, she is quite familiar with the judicial process.  See <u>Ochei v. Coler/Goldwater Mem'l Hosp.</u>, 450 F.Supp.2d 275 (S.D.N.Y. 2006) (granting summary judgment to defendant on plaintiff's Title VII action for discrimination based on race, national origin and gender, and for hostile work environment); <u>Ochei v. Helene Fuld Coll. of Nursing of North General Hosp.</u>, 22 A.D.3d 222 (1st Dep't 2005) (dismissing plaintiff's complaint alleging she was wrongfully terminated from her nursing college).  Since leaving the employment of All Care, plaintiff became employed as a nurse by Mary Manning Walsh Home.  (Pl. Aff. ex. C at 44:25 – 45:3.)  She is no longer employed there, but has since filed a complaint against them.  (<u>Id.</u> at 44:4-6.)

movant carries only "a limited burden of production," but nevertheless "must demonstrate more than some metaphysical doubt as to the material facts, and come forward with specific facts showing that there is a genuine issue for trial." Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citations and quotation omitted).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, . . . and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citations and quotations omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quotation omitted) (alteration in original); see also Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable") (quotation omitted), cert. denied, 540 U.S. 811 (2003).

## II. Timeliness of Plaintiff's Claims

For a Title VII claim of discrimination to be timely "in 'dual filing' states such as New York, a plaintiff must file the charge with the EEOC within 300 days of the allegedly

unlawful employment practice." Henry v. Wyeth Pharm., Inc., 05 Civ. 8106(CM), 2007 WL

2230096, at *28 (S.D.N.Y. July 30, 2007); see 42 U.S.C. 2000e-5(e)(1); see also Nat'l R.R.

Passenger Corp. ("AMTRAK") v. Morgan, 536 U.S. 101, 109 (2002).  Failure to file a timely

EEOC charge results in the dismissal of federal claims.  See id.  Here, plaintiff filed a complaint

with the EEOC on December 2, 2005.  (Pl. Exhibits ex. L.)  Thus, plaintiff's only timely claims

of discrimination are those referring to events that occurred on or after February 5, 2005.  There

is no basis for holding the statute of limitations equitably tolled.  See Morgan, 536 U.S. at 113.

In any event, as explained below, plaintiff cannot establish a prima facie case of discrimination

with respect to any of her claims, timely or not.  Thus, even assuming that all her claims are

timely, plaintiff cannot avoid summary judgment.

        For statute of limitations purposes, a hostile work environment claim is treated

differently from a discrimination claim because it "is composed of a series of separate acts that

collectively constitute one 'unlawful employment practice.'"  Id. at 117.  Thus, "[p]rovided that

an act contributing to the claim occurs within the filing period, the entire time period of the

hostile environment may be considered by a court for the purposes of determining liability."  Id.

(footnote omitted).  "In order for the charge to be timely, the employee need only file a charge

within . . . 300 days of any act that is part of the hostile work environment."  Id. at 118.  Thus,

plaintiff's hostile work environment claim is timely.

        Defendants also argue that plaintiff has failed to exhaust certain of her claims

because she did not raise them before the EEOC.  For the purposes of these motions, the Court

will assume that plaintiff has fully exhausted all of her claims.

III. <u>Title VII</u>

    Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment," on the basis of that individual's gender or national origin.  42 U.S.C. § 2000e-2.  Plaintiff raises two claims under Title VII: (1) that defendants discriminated against her on the basis of her national origin and gender, and (2) that defendants subjected her to a hostile work environment on the basis of her national origin and gender.

A. <u>Discrimination</u>

1. <u>Legal Standard</u>

    In the absence of direct evidence of discrimination, a court assesses claims of disparate treatment under Title VII in the context of the multi-part burden-shifting analysis described in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>Patterson v. County of Oneida, N.Y.</u>, 375 F.3d 206, 221 (2d Cir. 2004); <u>see</u> <u>also</u> <u>Rosen v. Thornburgh</u>, 928 F.2d 528, 533 (2d Cir.1991) (noting that "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent").

    Under the <u>McDonnell-Douglas</u> framework, a plaintiff has the initial burden of establishing a prima facie case of discrimination, which requires a showing that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  <u>See</u> <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 377-78 (2d Cir. 2003).  The burden imposed on plaintiff to establish a prima facie case has been

described as "minimal" and "de minimis." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (quotation omitted).

If a plaintiff is able to establish a prima facie case of discrimination, the defendant then has the burden of producing evidence of a "legitimate, nondiscriminatory reason" for the adverse employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quotation omitted). The defendant does not have any burden of persuasion. Bickerstaff v. Vasser Coll., 196 F.3d 435, 446 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000); see also McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer . . . [to engage in the adverse employment action]; the factual validity of the underlying imputation against the employee is not at issue.") (emphasis in original) (footnote, citation and quotation omitted). Indeed, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quotation omitted).

If the defendant meets this burden, the plaintiff must come forward with evidence from which a reasonable jury could conclude that the purported nondiscriminatory basis for the adverse action is pretextual. Id. at 143. To meet this burden, a plaintiff must produce "sufficient evidence to support a rational finding" that, "more likely than not," discrimination was the real reason for the adverse action. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996), abrogated on other grounds, Morgan, 536 U.S. at 101.

2. <u>Analysis</u>

   The first element of a prima facie case is satisfied because plaintiff, a Nigerian woman, is a member of a protected class.  The Court will assume that the second element -- that plaintiff was qualified for whatever nursing position with All Care or HHC she wished to attain -- is also satisfied.  However, with respect to each of her claims, plaintiff cannot establish that she suffered an adverse employment action, or she cannot establish that the alleged adverse action occurred under circumstances giving rise to an inference of discrimination, or she cannot establish both of these crucial elements.  Thus, plaintiff cannot establish a prima facie case of discrimination under Title VII.

   To show that she suffered an adverse employment action, plaintiff must offer evidence from which a reasonable jury could find that the complained-of act "created a materially significant disadvantage in . . . [her] working conditions."  <u>Beyer v. County of Nassau</u> 524 F.3d 160, 164 (2d Cir. 2008) (quotation omitted).  "To be materially adverse, . . . [the] change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  <u>Sanders v. New York City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004) (quotation omitted).  Moreover, plaintiff must "proffer objective indicia of material disadvantage."  <u>Beyer</u>, 524 F.3d at 164.  She cannot show that she suffered an adverse employment action merely by pointing to her "subjective, personal disappointment[ ]."  <u>Id.</u> (quotation omitted) (alteration in original).

   To establish the fourth element of her prima facie case, plaintiff must show that any adverse employment action occurred in circumstances giving rise to an inference of discrimination.  Plaintiff may satisfy this element by "showing that the employer treated plaintiff less favorably than a similarly situated employee outside [her] protected group."  <u>Mandell v.</u>

County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (quotation omitted).  To raise an inference

of discrimination, plaintiff must "show she was similarly situated in all material respects to the

individuals with whom she seeks to compare herself."  Id. (quotation omitted).  As will be

explained, plaintiff is unable to satisfy this element of a prima facie case.


        a. Transfers

        Plaintiff has failed to establish that she suffered an adverse employment action by

being transferred between HHC clinics and facilities.  As an initial matter, what plaintiff

describes as "transfers" were in fact an integral part of her job as a per diem employee of All

Care, a temporary employment agency.  (See O'Keeffe Aff. ¶¶ 2-3.)  The very reason that HHC

reached out to All Care for nurses like plaintiff was to fill nursing personnel needs that arose at

their facilities from time to time.  Moreover, as plaintiff concedes, all of these "transfers" were

optional.  (HHC 56.1 ¶ 9; Pl. 56.1 at 12 ¶ 12; Pl. Aff. ex. A at 85:6-14.)  Plaintiff had discretion

to accept an assignment or decline it.  (Id. at 85:6-14.)  Thus, plaintiff did not suffer an adverse

employment action on the occasions when she was asked to go from one facility to another

because such transitions were simply part of the job she performed for All Care.

        Even assuming that plaintiff's movements from one HHC facility to another can

accurately be described as "transfers," they still do not constitute adverse employment actions.

"A transfer that is truly lateral and involves no significant changes in an employee's conditions

of employment is not an adverse employment action regardless of whether the employee views

the transfer negatively."  Watson v. Paulson, 578 F.Supp.2d 554, 563 (S.D.N.Y. 2008); see

Garber v. New York City Police Dep't, 95 Civ. 2516(JFK), 1997 WL 525396, at *7 (S.D.N.Y.

Aug. 22, 1997) (holding that lateral transfer to NYPD's Recruitment Section was not an adverse

employment action because "Plaintiff's dissatisfaction with the transfer, standing alone, does not support his claim of an adverse employment action"); Menes v. City Univ. of New York Hunter Coll., 578 F.Supp.2d 598, 614-15 (S.D.N.Y. 2008) (holding that transfer of plaintiff from the Bursar's Office to the Accounting Department, where he would have to learn to use a new computer program, was not an adverse employment action, despite plaintiff's preference to remain in the Bursar's Office).  Here, plaintiff had no contractual entitlement to work at any specific HHC facility; she merely preferred certain ones over others.  (Pl. 56.1 at 11 ¶ 8; Pl. Aff. ex. A at 128:3-8.)  This subjective preference does not make her transfer to a less satisfactory facility an adverse employment action.

          Moreover, plaintiff has failed to identify any "material disadvantage" she suffered as a result of being transferred between facilities.  Beyer, 524 F.3d at 164.  All Care paid plaintiff the same per diem rate and provided her access to the same benefits regardless of the particular facility to which she was assigned on any given day.  (See Pl. Aff. ex. A at 111:16-18; Pl. Aff. ex. C at 50:16 – 51:12); see also Pacheco v. New York Presbyterian Hosp., 593 F.Supp.2d 599, 617-18 (S.D.N.Y. 2009) (holding that transfer was not adverse employment action because "even if the Court treats Plaintiff's move . . . to the [second] clinic as an involuntary transfer, there is nothing in the record to suggest that this transfer was tantamount to a demotion.  Plaintiff's transfer out of the [first] unit resulted in no change in pay, benefits, or bargaining unit seniority."); Pimentel v. City of New York, 00 Civ. 326(SAS), 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002) ("If an employee earns the same salary, has the same benefits, works the same hours . . . and has the same opportunities for promotion following a transfer then there is no adverse employment action, even if the employee is extremely unhappy about it.") (quotation omitted).  Plaintiff alleges in conclusory fashion that being transferred between clinics

made it more difficult for her to be hired as a permanent employee by HHC.  (See A.C. ¶ 13.)
However, plaintiff has offered no evidentiary support for this assertion.  Plaintiff's mere
unsubstantiated speculation that the transfers rendered her unable to "gain preference for a
permanent position for any open vacancies" (id.) is insufficient to avoid summary judgment.

        Even if plaintiff could establish that the transfers constituted adverse employment
actions, she has not raised evidence sufficient for a reasonable jury to find that the transfers
occurred under circumstances giving rise to an inference of discrimination.  Plaintiff's own
testimony establishes that she understood that HHC's decision to move her from one facility to
another was motivated by staffing needs, not discriminatory bias:

> Q: What was the discriminatory part of that issue?
>
> A: I was transferred.  Instead of staying at Sydenham . . . I was transferred to a
> different clinic on a daily basis.
>
> Q: And why were you transferred?
>
> A: When a nurse does not show up, I am sent there to work in her place.
>
> Q: So you were transferred because there was a staffing need?
>
> A: Yes, on a daily basis . . . .
>
> Q: And did [your supervisor, Ms. McBride,] tell you why you had to go?
>
> A: I don't ask her why -- I do not have to ask her why I have to go because it's
> well-understood that when she sends me at a clinic it means that that clinic is
> short of nurses.  That is the impression that they gave me from the beginning.

(Pl. Aff. ex. A at 117:23 – 118:4, 124:22 – 125:1 (emphasis added).)  Plaintiff further testified
that she "can't question" All Care's explanation for terminating her assignment at Renaissance
and thereafter assigning her to a different facility because she's "not in administration, so I don't
know if [their explanation is] true or not."  (Pl. Aff. ex. A at 100:20-23.)

Moreover, plaintiff admitted that she does not have any evidence that she was treated differently than any other per diem LPN assigned by All Care or other temporary employment agencies to HHC facilities.  (See Pl. Aff. ex. A at 122:17 – 123:7.)  Plaintiff argues that permanent HHC employees "also get paid to do their job like I was paid to do my job, and they were not sent from unit to unit like I was sent.  So that is what the difference is.  I got paid and they get paid like me, but they were not sent all over the place like I was sent all over the place."  (Id. at 113:15-23.)  The distinction between HHC's treatment of permanent employees and its treatment of plaintiff, a temporary per diem employee, does not raise an inference of discrimination because plaintiff was not "similarly situated in all material respects" to permanent employees of HHC.  Mandell, 316 F.3d at 379.

b. Refusal to hire

Plaintiff has likewise failed to introduce evidence that could reasonably give rise to an inference of discrimination with respect to her claim that HHC refused to hire her for a permanent position.  Plaintiff testified about two instances in which she unsuccessfully applied for full-time employment with HHC.  (See Pl. Aff. ex. A at 160:21 – 161: 20.)  On one occasion, plaintiff received no response to her application.  (Id.)  On another occasion, she received a letter stating that "all my LPN lines . . . are currently filled.  I will forward your resume to [Associate Directors of Nursing] of other services.  Should there be an opening in Behavioral Health, I will contact you for an interview."  (Zinaman Decl. ex. I.)  Plaintiff claims that this was discriminatory because, since applying, HHC has hired other nurses.  (Pl. Aff. ex. A at 162:21-25.)  However, plaintiff conceded, "I don't know if they were hired as per diem, I don't know.  I don't know if they were hired as full-time, I don't know.  But I put in to become a full-time."

(Id. at 149:10-12.)  Plaintiff stated that she did not believe any other Nigerians had been hired because she "never came across any Nigerian nurse" but admitted that she did not know for certain whether any Nigerians were hired.  (Id. at 163:7 – 164:4.)  She further admitted that she did not know whether any other Nigerians ever applied for full-time employment with HHC. (Id.)

    Plaintiff also argues that HHC's refusal to hire her was discriminatory because Ms. McBride, her supervisor, did not want her to get full-time employment benefits.  (Id. at 150:8-10.)  However, plaintiff conceded that she has no evidentiary support for this claim, apart from her own speculation:

> Q: Who told you that Ms. McBride didn't want you to get benefits?
>
> A: Nobody told me that.  I'm just saying that the reason -- I told her that the reason why I'm applying for the job is because I wanted to become full-time so I can get benefits like my colleagues.
>
> Q: But who . . . told you that Ms. McBride didn't want you to get benefits?  Did she tell you that?  Did somebody else tell you?
>
> A: That is my conclusion based on the fact that I had explained to her the reason why I wanted to get on staff. . . .
>
> Q: Did anybody else notify you that you did not get the job because Ms. McBride did not want you to get benefits?
>
> A: I just told you that that was my inference . . . That was what my conclusion was based on the fact that I had explained to her the reason why I wanted to get the job.
>
> Q: So nobody told you this.  This is what you call your inference?
>
> A: Yes.

(Id. at 150:22 – 151:15.)  In sum, plaintiff has no evidence that she was treated differently than anyone similarly situated to her, and she has no evidence that Ms. McBride was motivated by a desire to deny her benefits because of her national origin or gender.  Plaintiff's mere unsupported

speculation that HHC discriminated against her by refusing to hire her permanently is insufficient to defeat summary judgment.[4]

### c. Termination

Plaintiff claims that she was terminated by All Care.  (A.C. ¶ 19.)  Yet, this allegation is contradicted by plaintiff's own testimony in which she admitted to voluntarily leaving All Care.  (Pl. Aff. ex. C at 64:8-9 (stating that All Care's alleged failure to pay plaintiff annual leave in 2004 was "one of the reasons why I left them").)  The undisputed evidence is that after HHC asked All Care to stop sending plaintiff to their facilities, All Care offered plaintiff a number of non-HHC assignments, but plaintiff turned them all down.  (See O'Keeffe Aff. ¶ 11.)  Thus, plaintiff has not raised a triable issue of fact with respect to her claim that All Care fired her.  Nor is there any evidence that, even if All Care did terminate plaintiff, it did so under circumstances giving rise to an inference of discrimination.

Plaintiff argues that HHC's decision to request that All Care stop assigning her to HHC facilities was discriminatory.  It is undisputed that, following plaintiff's altercation with Ms. Diaz in on May 3, 2004, her altercation with Mr. Waiters on November 1, 2005 and her altercation with Ms. Ramos on November 17, 2005, plaintiff received a call from All Care on November 28 directing her to leave the HHC facility immediately because HHC had terminated her assignment.  (Pl. 56.1 at 20 ¶ 31; Pl. Aff. ex. C at 8:20 – 9:4, 27:22 – 33:17, 92:22-25.)  As an initial matter, it is not clear that this was an adverse employment action because All Care continued to offer plaintiff per diem nursing assignments at non-HHC facilities.  (See O'Keeffe Aff. ¶ 11.)  But even assuming that this was an adverse employment action, plaintiff has offered

---

[4] The Court also notes that this claim is significantly undermined by the fact that HHC did, in fact, hire plaintiff to a full-time position in 1991, before she began working at All Care.  See Ochei, 450 F.Supp.2d at 278.

no evidence that anyone at HHC was motivated by discriminatory bias.  To the contrary, it appears that HHC took this action in response to a well-documented trend of disruptive, unprofessional altercations between plaintiff and other HHC employees.  (See Zinaman Decl. ex. J, K, L, M, and N.)  Thus, HHC's request that All Care not assign plaintiff to its facilities was not an adverse employment action; there is no evidence that it occurred under circumstances giving rise to an inference of discrimination; and in any event, plaintiff has not shown that HHC's legitimate, nondiscriminatory rationale was pretextual.

        d. Other allegedly discriminatory actions

      Plaintiff claims that she was required to undergo performance evaluations by HHC, and that these evaluations were discriminatory because only permanent staff were supposed to be evaluated.  (See Pl. Aff. ex. C at 36:23 – 37:12.)  This argument is has no merit because being evaluated did not subject plaintiff to any "material disadvantage," Beyer, 524 F.3d at 164, particularly since the evaluations were satisfactory.  (See Pl. 56.1 at 13 ¶ 13.)

      Plaintiff argues that Ms. McBride discriminated against plaintiff because she "several times" scheduled plaintiff for overtime and then "cancel[led] at the very last minute" and had a permanent staff member do the overtime work instead.  (Pl. 56.1 at 18 ¶ 26; Pl. Aff. ex. A at 125:10-19.)  First, plaintiff, a per diem employee of All Care, was not "similarly situated in all material respects" to permanent employees of HHC.  Mandell, 316 F.3d at 379.  Second, as discussed above, it was inherent in plaintiff's role as a temporary employee that she would fill in depending on HHC's staffing needs at any given time.  An occasional, minor alteration in her schedule did not constitute an adverse employment action.  See Williams v. New York City Hous. Auth., 03 Civ. 7764(WHP), 2008 WL 2695139, at *3 (S.D.N.Y. June 29, 2008) ("Where

assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules or work assignments . . . do[es] not rise to the level of [an] adverse employment action.") (quotation omitted) (alterations in original).

Plaintiff claims she was subject to discrimination because two colleagues, Mr. Waiters and Ms. Cox, made derogatory comments about plaintiff's national origin during an altercation on November 1, 2005.  (Pl. Aff. ex. C at 8:13 – 26:12; Pl. 56.1 at 24 ¶ 42, 25 ¶ 44.) This claim has no merit because neither Mr. Waiters nor Ms. Cox was plaintiff's supervisor; both comments were stray, isolated remarks; and there is no evidence linking either comment to any adverse employment action taken against plaintiff.  (See id. at 20-25 ¶¶ 32-44); see also Early v. Wyeth Pharm., Inc., 07 Civ. 0947(WCC), 2009 WL 497362, at *22 (S.D.N.Y. Feb. 25, 2009) ("Courts in this circuit have held that stray remarks 'without more,' even when made by a decisionmaker, 'do not constitute sufficient evidence to make out a case of employment discrimination.'") (quoting Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998)).

In 2004, plaintiff complained in a voicemail to Mr. O'Keeffe, vice president of local and international staffing for All Care, that she had not been paid for the annual leave to which she was entitled.  (O'Keeffe Aff. ¶ 1; Pl. Aff. ex. C at 64:22 – 66:5.)  She did not, however, make her complaint in writing.  (Id. at 66:11.)  First, earnings statements submitted by All Care appear to establish that plaintiff was fully compensated for all of the annual leave to which she was entitled.  (See Fahey Aff. ex. 3; O'Keeffe Aff. ¶ 9.)  But even assuming that plaintiff could establish that she was not fully paid, she has offered no evidence from which a reasonable jury could infer that Mr. O'Keeffe discriminated against her on the basis of her national origin or gender.  (See Pl. Aff. ex. A at 73:2-10 (testifying that she does not know whether Mr. O'Keeffe treated her differently than any other per diem employee).)  Plaintiff also

complains about the fact that All Care offered plaintiff health benefits at a cost to her of $35 per week, which she declined because they were too expensive.  (Pl. 56.1 at 12 ¶ 11.)  However, because plaintiff submitted no evidence showing that All Care offered other per diem LPN's more attractive health benefits, this raises no inference of discrimination.

A review of the record reveals no evidence from which a reasonable jury could conclude that plaintiff was subjected to employment discrimination based on her national origin or gender.  Plaintiff's "subjective impressions" that she was discriminated against are not sufficient to defeat summary judgment.  Littman v. Firestone Tire & Rubber Co., 709 F.Supp. 461, 466 (S.D.N.Y. 1989); see also Bickerstaff, 196 F.3d at 448 (instructing courts to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture").  As the court noted in Magadia v. Napolitano, 06 Civ. 14386(CM), 2009 WL 510739, at *13 (S.D.N.Y. Feb. 26, 2009), a plaintiff cannot "make out a prima facie case of discrimination" merely by "reasoning . . . [that] (1) something bad happened to him; (2) he is Filipino; (3) therefore the bad thing happened because he is Filipino."  Thus, defendants are entitled to summary judgment on plaintiff's claim of discrimination under Title VII.

B. Hostile Work Environment

1. Legal Standard

Defendants also move for summary judgment on the grounds that plaintiff cannot establish that she was subject to a hostile work environment.  "To defeat a motion for summary judgment on a claim of . . . hostile work environment, 'a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s

sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  Patterson,

375 F.3d at 227 (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000))

(alterations in original).  The Second Circuit has explained:

> The matter of whether the conduct alleged was so "severe or pervasive" as to
> create "an objectively hostile or abusive work environment," . . . is to be decided
> based on the totality of the circumstances, in light of such factors as the
> "frequency of the discriminatory conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive utterance; and whether it
> unreasonably interferes with an employee's work performance."

Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 23 (1993)).  In applying these factors to

a given case, "isolated incidents ordinarily will not rise to the level of a hostile work

environment."  Id.  "A plaintiff must also demonstrate that she was subjected to the hostility

because of her membership in a protected class."  Kassner v. 2nd Avenue Delicatessen Inc., 496

F.3d 229, 241 (2d Cir. 2007) (quotation omitted).

In order to prevail on a hostile work environment claim, a plaintiff must also

show that "a specific basis exists for imputing the conduct that created the hostile environment to

the employer."  Howley v. Town of Stratford, 217 F.3d 141, 154 (2d. Cir. 2000) (quotation

omitted).  Where the harassment was perpetrated by a coworker and not by a supervisor, the

plaintiff must demonstrate that the employer "either provided no reasonable avenue for

complaint or knew of the harassment but did nothing about it."  Van Zant, 80 F.3d at 715

(quotation omitted); see Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63 (2d Cir. 1998) ("[W]hen

the harassment is attributable to a co-worker, rather than a supervisor, . . . the employer will be

held liable only for its own negligence.").

2. <u>Analysis</u>

Plaintiff has failed to come forth with evidence from which a reasonable jury could find that her workplace -- either at All Care or at any combination of HHC facilities -- was permeated with discriminatory intimidation, ridicule or insult sufficiently severe or pervasive to alter the conditions of her employment.  <u>See</u> <u>Patterson</u>, 375 F.3d at 227.  Plaintiff's first altercation with a coworker occurred with Ms. Diaz on May 3, 2004.  (Pl. 56.1 at 20 ¶ 31.)  Although the record reveals few details about this altercation, plaintiff can point to nothing even suggesting that the altercation had a discriminatory basis to it.  Moreover, Ms. Diaz was not plaintiff's supervisor, and the record shows that plaintiff's supervisor, Ms. McBride, took appropriate remedial action by resolving that plaintiff and Ms. Diaz would no longer work at the same clinic at the same time.  (Zinaman Decl. ex. J.)

The second incident in the record, and the main basis for plaintiff's hostile work environment claim, is the verbal altercation with Mr. Waiters on November 1, 2005.  (Pl. 56.1 at 20 ¶ 32; Pl. Aff. ex. C at 8:20 – 9:4.)  During this altercation, two discriminatory remarks were allegedly made.  First, Mr. Waiters made a comment about calling immigration authorities to have plaintiff deported.  (Pl. 56.1 at 22 ¶ 38.)  And second, Ms. Cox, standing nearby, stated that plaintiff "didn't belong here, to work here" because she was Nigerian.  (Pl. 56.1 at 24 ¶ 42, 25 ¶ 44.)  The Court will assume, for the purposes of these motions, that these two comments constituted derogatory remarks about plaintiff's national origin.  Mr. Waiters had never previously made a derogatory remark about plaintiff's national origin, and never did so again.  (Pl. Aff. ex. C at 16:10 – 17:11, 18:2-5.)  In addition, Mr. Waiters had, on previous occasions, made offensive sexual gestures toward plaintiff, and plaintiff had complained about him to a coworker but had never filed a written complaint.  (Pl. 56.1 at 21-22 ¶ 35.)  Viewing the

evidence in its totality and in the light most favorable to plaintiff, these derogatory remarks and gestures were neither severe nor pervasive.  Furthermore, neither Mr. Waiters nor Ms. Cox was plaintiff's supervisor, and the record shows that HHC took appropriate remedial action by transferring Mr. Waiters to a different facility.  (Pl. Aff. ex. C at 17:20-22.)  Thus, no reasonable jury could find that these occurrences created a hostile work environment.  See Harris, 510 U.S. at 21 (the "mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII") (citations and quotation omitted); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . there must be a steady barrage of opprobrious racial comments") (quotations and citations omitted); Clerge v. Consol. Edison, 95 Civ. 9072(MBM), 97 Civ. 8554(MBM), 1999 WL 239688, at *3 (S.D.N.Y. Apr. 23, 1999) (four racially "tinged" incidents not severe or pervasive enough to create a hostile work environment).

The final incident which plaintiff argues contributed to a hostile work environment was an altercation between plaintiff and Ms. Ramos on November 17, 2005.  (Pl. Aff. ex. C at 27:22 – 33:17.)  The incident began when Ms. Ramos accused plaintiff of discriminating against Hispanic patients.  (Id.)  Plaintiff found that "Ms[.] Ramos' disruptive and conflictive presence at an already hectic environment and her inability and/or reluctance to follow simple directives subjected Plaintiff to a hostile work environment."  (Pl. 56.1 at 27 ¶ 50.)  Viewing this dispute in the totality of the evidence, no reasonable jury could find that the conduct was pervasive or severe.  Nor is there any basis for finding that Ms. Ramos "subjected [plaintiff] to the hostility because of [her] membership in a protected class."  Kassner, 496 F.3d at 241.  And, as with all of the incidents about which plaintiff complains, Ms. Ramos was not

plaintiff's supervisor and plaintiff has failed to show a "specific basis" for imputing the conduct of her coworkers to All Care or HHC.  Howley, 217 F.3d at 153-54.  Thus, plaintiff has failed to raise a triable issue of fact with respect to her claim of a hostile work environment and defendants are entitled to summary judgment.

IV. State Law Claims

       Plaintiff also brings claims under the NYSHRL and NYCHRL.  "Claims of discrimination brought under [NYS]HRL and the NYCHRL are analytically identical to claims brought under Title VII and are reviewed under the same burden-shifting analysis."  Giannone v. Deutsche Bank Sec., Inc., 392 F.Supp.2d 576, 586 (S.D.N.Y. 2005).  "The legal standard applied to a hostile work environment claim under the NYSHRL and NYCHRL is the same as that applied under Title VII."  Pacheco, 593 F.Supp.2d at 623 n.12 (citing Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005); Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 n.3 (2004)).  Thus, defendants are entitled to summary judgment on plaintiff's NYSHRL and NYCHRL claims for the same reasons that they are entitled to summary judgment on plaintiff's Title VII claims.

       Defendants are also entitled to summary judgment on plaintiff's state law claims because, under the election-of-remedies rule, plaintiff waived her right to sue in court when she filed a charge with the SDHR on December 8, 2005.  (Pl. Exhibits ex. L); see N.Y. Exec. Law § 297(9); N.Y.C. Admin. Code § 8-502(a); Lopes v. Caffe Centrale LLC, 06 Civ. 9927(RWS), 2009 WL 102212, at *1-*2 (S.D.N.Y. Jan. 14, 2009).

V. <u>Leave to Amend</u>

   Plaintiff seeks leave to file a Second Amended Complaint.  (Doc. #46.)  Leave to amend should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  But leave should be denied in the case of delay, bad faith, futility, or prejudice to the non-moving party.  <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co.</u>, 404 F.3d 566, 603-04 (2d Cir. 2005).  Leave to amend may be denied as futile where the claim or defense to be added has no "colorable merit."  <u>Posadas de Mexico, S.A. de C.V. v. Dukes</u>, 757 F.Supp. 297, 302 (S.D.N.Y. 1991).

   Plaintiff has submitted her proposed Second Amended Complaint and a thorough review of it reveals that it adds no plausibly meritorious claims.  Furthermore, permitting an amendment at this late stage in the litigation would cause significant prejudice to defendants, particularly since plaintiff could have raised these new claims in her First Amended Complaint. <u>See</u> <u>Ansam Assoc., Inc. v. Cola Petroleum, Ltd.</u>, 760 F.2d 442, 446 (2d Cir. 1985) ("[P]ermitting the proposed amendment would have been especially prejudicial given the fact that discovery had already been completed and [the defendant] had already filed a motion for summary judgment."); <u>Williams v. Bank Leumi Trust Co. of New York</u>, 96 Civ. 6695(LMM), 2000 WL 343897, at *2 (S.D.N.Y. March 31, 2000) ("A motion to amend a complaint is particularly disfavored where the amendment is proposed in response to a summary judgment motion."); <u>S.E.C. v. Norton</u>, 21 F.Supp.2d 361, 363 (S.D.N.Y. 1998) (denying leave to amend because it appeared that plaintiff sought to amend the complaint "solely to avoid an adverse ruling on [defendant's] summary judgment motion").

## CONCLUSION

For the foregoing reasons, All Care's and HHC's motions for summary judgment are granted, and plaintiff's request for leave to amend is denied. The Clerk shall enter judgment for defendants. Defendants are directed to provide plaintiff with copies of all unpublished opinions cited herein.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
March 31, 2009

28